NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 180650-U

NO. 4-18-0650

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 10, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| ELOY MURAIDA JR., | ) | No. 16CF275 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Turner and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, holding (1) the State proved defendant guilty beyond a reasonable doubt, (2) the trial court's Rule 431(b) admonishments were sufficient, (3) the prosecutor's closing argument did not constitute misconduct, and (4) the trial court's consideration of the emotional harm to the victim was not a double enhancement.

¶ 2    Defendant, Eloy Muraida Jr., was charged by information in December 2016 with one count of criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2016)), a Class 1 felony, and two counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2016)), both Class 2 felonies. He was later charged in January 2018, by way of a supplemental information, with three additional counts alleging predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(b)(1) (West 2016)), all Class X felonies with a sentencing range of 6 to 60 years in the Illinois Department of Corrections (DOC). Defendant proceeded to trial in May 2018, but immediately before the trial began, the State moved to dismiss counts I-III and elected

- 1 -

to proceed only on counts IV-VI, the predatory criminal sexual assault counts. Defendant was found guilty of all three counts and sentenced to three 40-year terms of incarceration to be served consecutively, along with a mandatory supervised release period of 3 years to life on each count. In August 2018, defendant filed a timely "Motion for New Trial and Other Post-Trial Relief" along with a "Motion for Reconsideration of Sentence." Both were heard in September 2018 and denied. Defendant filed a timely notice of appeal.

¶ 3                                    I. BACKGROUND

¶ 4          Defendant was charged with criminal sexual assault, a Class 1 felony (count I) and two counts of aggravated criminal sexual abuse, Class 2 felonies, (counts II and III) in December 2016. The offenses were alleged to have occurred in 2011 and 2013-2014. The victim was A.A., his stepdaughter. Count I alleged defendant was a family member and the victim was under 18 at the time "defendant placed his fingers in the vagina of A.A." Counts II and III alleged defendant was at least 17 years of age and the victim was under 13 years of age when defendant "knowingly placed his hands inside the pants of A.A. and touched the vagina of A.A." and "knowingly placed mouth [*sic*] on the vagina of A.A." In January 2018, the State filed a supplemental information charging defendant with three additional counts of predatory criminal sexual assault, all Class X felonies (counts IV-VI) alleging sexual penetration of defendant's penis in the vagina (count IV), anus (count V), and mouth (count VI) of A.A. These offenses were alleged to have occurred from 2010 to July 2014, when the victim was under 13 years of age. Defendant went to trial in May 2018, at which time the State dismissed counts I-III, proceeding, without objection, only on the three counts of predatory criminal sexual assault.

¶ 5          Prior to the beginning of a two-day trial in May 2018, the trial court discussed the penalties applicable to the three Class X felony counts with defendant as well as any previous

- 2 -

plea negotiations with the State. Defendant and counsel acknowledged the State's offer of 20 years to be served at 85% was rejected.

¶ 6                                    A. Jury Selection

¶ 7          During questioning of the first 18 prospective jurors, the trial court said the following:

> "THE COURT: This is a criminal trial so I do have to recite the propositions of law for you again. So please listen carefully as I will be asking if you understand these principles of law and if you accept these principles of law.
>
> A person accused of a crime is presumed to be innocent of the charge against him. The fact that a charge has been made is not to be considered as any evidence or presumption of guilt against the Defendant.
>
> The presumption of innocence stays with the Defendant throughout the trial and is not overcome unless from all of the evidence you believe the State proved the Defendant's guilt beyond a reasonable doubt. The State has the burden of proving the Defendant's guilt beyond a reasonable doubt. The Defendant does not have to prove his innocence. The Defendant does not have to present any evidence on his own behalf and does not have to testify if he does not wish to. If the defendant does not testify, that fact must not be considered by you in any way in arriving at your verdict.

So by a show of hands, do each of you understand these principles of law? If so, please raise your hand.

PROSPECTIVE JURORS: (All raise hands.)

THE COURT: Okay. All hands are raised. And do each of you accept these principles of law? If so, again please raise your hand.

PROSPECTIVE JURORS: (All raise hands.)"

The court repeated these admonishments verbatim to the next panel of 16 prospective jurors and received the same responses. Neither the State nor defendant objected to the court's method of questioning and no claim of error was raised in defendant's posttrial motions.

¶ 8                                              B. Trial

¶ 9          A.A., the victim in this case, was 16 at the time she testified as the State's only witness. She said she had been sexually assaulted by defendant, who was her mother's boyfriend at the time, beginning when she was about 10 years old and in fifth grade. She described how the first sexual encounters took place in her room at the address in Pontiac where she, her mother, and her sister moved when they began living with defendant. She said she shared bunk beds with her sister and defendant would come into the room at night, kneeling next to her bed, and he "slid his hand down my pants and just placed it on my vagina." A.A. testified after the first incident, sometime in November or December of her fifth-grade year, this happened again a "few months" later. A.A. also testified that approaching the end of her fifth-grade year, the nature of defendant's touching changed, and he began touching her vagina in what she described as a "hard" circular, rubbing motion.

¶ 10        She testified that sometime around the start of sixth grade, when she was 11, on one occasion, defendant licked her vagina, and it was not until "a year or two" later that he began touching her with his penis. By this time, she said, they were living at the address they moved to when she was in sixth or seventh grade.

¶ 11        When asked how old she was when defendant "first started using his penis" on her, A.A. testified she was 12 years old. She described the first occasion being when he asked her to "cuddle" with him while he had his penis exposed. She said acts of anal penetration preceded those of vaginal penetration and occurred at both houses. She also testified defendant engaged in repeated acts of vaginal intercourse as well as more frequently forcing her to perform oral sex on him, telling her that if she told her mother, "he would tell her that I was a whore, and no one would believe me." A.A. testified the incidents of forced oral sex occurred both in the bathroom and bedroom. A.A. said defendant engaged in acts of anal penetration as well, beginning when they still lived at the first house. However, A.A. said the acts of vaginal or anal penetration did not occur with the same frequency as acts of oral sex or digital manipulation.

¶ 12        A.A. acknowledged she never told her mother what defendant was doing to her because, "I never thought I could because I was scared."

¶ 13        On cross-examination, A.A. repeated she and her family began living with defendant when she was in fifth grade. She indicated they moved to the second house "a few years after" and when asked to clarify, A.A. said she moved to the second house when she was "11, 12 or 13," and moved again to some apartments when she was "14 and 15." She acknowledged having given statements to various people over the course of the investigation leading to these charges and agreed she gave her first statement in October 2016. A.A. also acknowledged some of the incidents where defendant put his hand down her pants and touched

her vagina, beginning when she was in fifth grade, were when her mother or sister were in close proximity or the same room. Despite their presence, she acknowledged she did not cry out. She also admitted never telling any person at her school until she told a school counselor in "2015. '16."

¶ 14        A.A. agreed she was "12 or 13" and in sixth grade when the family moved to the second house and defendant began putting his penis in her mouth. When asked to estimate the number of times this happened in the bathroom, she said "more than ten." A.A. also acknowledged the first time defendant did this was also the first time he threatened her about telling—telling her she was a whore and no one would believe that she did not want to do it. When asked about the incidents of vaginal intercourse, A.A. said she was "12 or 13", and that it hurt but she did not cry out, even though her sister was in the same room some of the time. A.A. affirmed she first told police about the incidents of "oral and vaginal and anal intercourse" sometime after two previous statements and after she had spoken with Michael L. in October or November 2017. Michael L. was the man with whom her mother began a relationship after splitting with defendant. She also acknowledged giving the more detailed statements to the police after Michael L. made comments about how she might have to go to "Streamwood," a mental hospital.

¶ 15        A.A. also agreed there were times she and defendant went on motorcycle rides or went shopping together and there were no problems. She also acknowledged he was somewhat more strict with her than her mother was, refusing to allow her to see a particular boy and requiring her to do chores around the house, which she admitted would "make her mad."

¶ 16        On redirect, she explained she had not disclosed the full extent of the sexual abuse in the beginning because she was "scared to tell. I was uncomfortable telling." As she described

it, the incidents of actual sexual penetration were more difficult for her to tell. She also agreed there were times when she was able to "have fun" with defendant, but that was during the daytime when sexual incidents were not occurring. A.A. explained how she did not know how to react when the sexual abuse was occurring and as a result, she did not "cry out" or ask for help.

¶ 17        Questioning continued to alternate between the prosecutor and defendant's counsel to clarify exactly how old she was when the sexual intercourse took place. A.A. said the following: In response to defense counsel, she said it occurred at the first address when she was "12 or 13." On redirect, she said it happened over a period of years and responded affirmatively when the prosecutor asked, "it happened when you were 13 *and* when you were 12?" (Emphasis in original.) During further re-cross-examination, she could not remember the exact age, but "I remember it happened when I was around 12." "12 or 13."

¶ 18        The State rested with no further evidence other than a stipulation regarding defendant's birth date. Defendant moved for a directed verdict, contending A.A.'s testimony indicated she was unsure whether the sexual acts alleged in the three counts occurred before or after her thirteenth birthday. This, he said, was critical to the charged offense since each count claimed and required her to be "under the age of 13" at the time of the sexual acts alleged. The trial court found there was sufficient evidence to survive a motion for a directed verdict.

¶ 19        Defendant presented five witnesses including his son, a life-long friend, defendant's son's girlfriend, another friend who had known defendant "over 20 years," and a female hair stylist who did A.A.'s hair for a number of years. Each of the witnesses testified they had seen defendant and A.A. together at numerous times, under a variety of circumstances, and they never observed any untoward behavior between the two. They also testified the two seemed

to have a "normal father-daughter relationship," and at no time did A.A. appear to be afraid of, hesitant, or reluctant to be with defendant.

¶ 20    The defense rested. The jury returned verdicts of guilty on all three counts.

¶ 21                    C. Sentencing

¶ 22    After a presentence investigation and report, defendant was sentenced in July 2018. The sentencing range on the three counts of predatory criminal sexual assault was 6 to 60 years, by statute (720 ILCS 5/11-1.40(b)(1) (West 2016)). In addition, they were subject to mandatory consecutive sentencing. See 730 ILCS 5/5-8-4(d) (West 2016); *People v. Pippen*, 324 Ill. App. 3d 649, 656, 756 N.E.2d 474, 480 (2001). No evidence in aggravation or mitigation was presented, the State relying instead on the presentence report and A.A.'s victim impact statement already on file. The State recommended a sentence of 25 years on each count, which, due to consecutive sentencing, would amount to 75 years in DOC. Defendant argued for the minimum of 6 years on each count, for a total of 18 years. When offered his right of allocution, defendant declined.

¶ 23    During its comments preceding imposition of sentence, the trial court noted:

> "There are a number of things the Court is to take into consideration to determine the appropriate sentence here. And those matters are spelled out very clearly in the statute. And the statute does give the Court a lot of guidance, not just in terms of aggravating and mitigating factors, but also in the other matters the Court is to take into consideration, including the evidence that was received at trial in this case. [Defense counsel] has referenced rehabilitative potential; and of course, all other matters that may be relevant to this sentencing hearing."

The court went on to say:

"I have reviewed very carefully before coming in here today, but also listened carefully to the recommendations received today, reviewed the PSI, and have considered the evidence that was received at trial, and the evidence in aggravation and mitigation that was presented here today."

¶ 24　The trial court further noted the case was an emotional one for all involved, including defendant and his family as well as the victim and hers. Mindful of claims of double enhancement based on comments of a court at sentencing, the trial court sought to explain how and why the legislature considers these offenses as "very serious." The court noted the actions of defendant were not "an isolated incident," but instead constituted a "pattern of abuse on several occasions over an extended period of time." The fact that defendant held a position of trust with the victim was also considered by the court, as well as the long-term emotional damage to the victim. The court also found deterrence to be "a very strong factor in this case." Based on the seriousness of the offense and the fact defendant had a similar conviction previously, the court found an extended sentence was not inappropriate. The trial court then imposed a sentence of 40 years on each count, for an aggregate sentence of 120 years to be served at 85%, and informed defendant of his appeal rights.

¶ 25　Defendant filed a motion for a new trial and other posttrial relief in August 2018. His claims of error were essentially that: (1) the evidence presented was insufficient to prove his guilt beyond a reasonable doubt, (2) the State failed to prove each of the essential elements of the offenses charged beyond a reasonable doubt, and (3) there was insufficient evidence to prove the offenses occurred in Livingston County, Illinois.

¶ 26　At the same time, defendant filed a motion seeking reconsideration of his sentence, contending the trial court (1) failed to consider all mitigation factors and imposed a

sentence which was "unduly harsh and punitive," (2) abused its discretion by imposing a sentence which was excessive and "disproportionate to the nature of the offense," and (3) failed to impose a sentence which included an objective to restore defendant to useful citizenship or adequately consider the financial impact of the cost of incarceration.

¶ 27         Both motions were denied by the trial court and this appeal follows.

¶ 28                              II. ANALYSIS

¶ 29         Defendant asserts four claims of error on appeal: (1) the State failed to prove beyond a reasonable doubt the victim was under 13 years of age when the three acts alleged in counts IV, V, and VI were to have occurred, (2) the trial court gave improper Rule 431(b) admonishments to prospective jurors during *voir dire* (see Illinois Supreme Court Rule 431(b) (eff. July 1, 2012)), (3) defendant was denied a fair trial due to prosecutorial misconduct during closing arguments, and (4) the trial court erred when it improperly considered a factor implicit in the offense as an aggravating factor at sentencing.

¶ 30                         A. Proof of A.A.'s Age

¶ 31         Defendant challenges the sufficiency of the evidence regarding the age of the victim at the time the sexual acts were committed. When we review such a challenge, the question to be answered is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319). This is our standard of review. *People v. Cunningham*, 212 Ill. 2d 274, 278-79, 818 N.E.2d 304, 307 (2004). According to the *McLaurin* court, this standard recognizes the " 'responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to

- 10 -

ultimate facts.' " *McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson*, 443 U.S. at 319). Further, it cautioned that "[i]n reviewing the evidence, this court will not retry the defendant, nor will we substitute our judgment for that of the trier of fact." *McLaurin*, 2020 IL 124563, ¶ 22.

¶ 32     Defendant contends the evidence of A.A.'s age at the time of the sexual acts alleged was "so unsatisfactory that it creates a reasonable doubt of the defendant's guilt" and therefore his conviction must be reversed. See *People v. Smith*, 185 Ill. 2d 532, 542, 708 N.E.2d 365, 370 (1999). Our supreme court's observation in *Smith* was further discussed in *Cunningham*, in the context of the credibility of a police witness. The supreme court explained that "[t]estimony may be found insufficient under the *Jackson* standard, but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 280. It is not sufficient that some may question the evidence, but only where *no reasonable person* could accept it. In *Cunningham*, the court questioned the veracity of the police witness's testimony in three different particulars, calling them "unresolved questions about certain statements [the witness] made." *Cunningham*, 212 Ill. 2d at 283. Yet, it found "even when a witness is found to have knowingly given false testimony on a material point, a fact finder may reject his entire testimony, but is not bound to do so. [Citations.]" *Cunningham*, 212 Ill. 2d at 283. Going further, it noted, "it is for the fact finder to judge how flaws in part of the testimony affect the credibility of the whole." *Cunningham*, 212 Ill. 2d at 283.

¶ 33     Here, we are not dealing with an issue of credibility, we are dealing with A.A.'s recollection of her age at the time of the sexual acts alleged. If fact finders are permitted to assess the believability of certain testimony considering what they conclude to be otherwise false statements of the witness, and still find the witness's overall testimony credible, how much more

- 11 -

so are they able weigh the recollection of the victim? Both the State and the defense conducted an exhaustive examination of A.A.'s recollection of her age when the sex acts alleged in the information began. Her best recollection was "12 or 13," but she also acknowledged in response to the prosecutor's questions they occurred when she was 12 *and* 13. When questioned again by defense counsel, although she was unable to remember her exact age when the charged offenses began, she said, "I remember it happened when I was around 12. *** 12 or 13." In context, her testimony revealed a long-term period of sexual abuse beginning when she was 10 years old and in fifth grade. It continued, moving into more invasive forms of sexual contact which culminated in anal, vaginal, and oral penetration, over an extended period of time. The jury, as the finders of fact, were able to observe A.A. testify and heard her explanations, on both direct and cross-examination, of what happened, where, and when. Would it perhaps have been better if the State called another family member to verify when, exactly, the various moves took place? Or, how old A.A. was at different times when they lived with respondent? Perhaps. But its failure to do so does not preclude the jury from finding there was sufficient proof of her age when the acts began. Insufficiency under the *Jackson* standard requires us to find the record evidence "compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 280. Such is not the case here, and we will not substitute our judgment for that of the trier of fact. *McLaurin*, 2020 IL 124563, ¶ 22.

¶ 34                                    B. Rule 431(b) Admonishments

¶ 35           Defendant argues for the first time on appeal the trial court erred in its Rule 431(b) admonishments by "grouping the principles into one broad statement of law." He claims that by doing so, the trial court failed to ensure potential jurors both understood and accepted each of the four distinct principles contained in the rule. Defendant acknowledges he never

raised the issue before the trial court by objection during admonishments or in a posttrial motion, thereby failing to preserve the issue for appellate review. See *People v. Enoch*, 122 Ill. 2d 176, 188, 522 N.E.2d 1124, 1131 (1988) (stating to preserve an issue for appellate review, a defendant must object both at trial and in a posttrial motion). Instead, he seeks to avoid his procedural default by claiming we should consider the issue under the doctrine of plain error since the court's failure was "clear and obvious."

¶ 36    Once again describing the doctrine as a "narrow and limited exception to the general [rule of procedural default]" (*People v. Herron*, 215 Ill. 2d 167, 177, 830 N.E.2d 467, 474 (2005)), in *People v. Jackson*, 2020 IL 124112, ¶ 81, our supreme court recently reminded us of the circumstances under which we may consider an issue otherwise forfeited under plain error:

> "A reviewing court will consider unpreserved error when a clear or obvious error occurs and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence."

¶ 37    It further explained, absent a showing of plain error, we must honor defendant's procedural default. *Jackson*, 2020 IL 124112, ¶ 81. The Illinois Supreme Court has also told us how we may begin our plain error analysis. In applying the plain error doctrine, it is appropriate to determine first whether error occurred at all (*People v. Hillier*, 237 Ill. 2d 539, 545, 931 N.E.2d 1184, 1187 (2010)) because "without error, there can be no plain error." *People v. Smith*,

372 Ill. App. 3d 179, 181, 865 N.E.2d 502, 504 (2007); see also *People v. Hood*, 2016 IL 118581, ¶ 18, 67 N.E.3d 213.

¶ 38 As defendant correctly notes, the question of whether a trial court violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), and, if so, the effect of noncompliance, is reviewed *de novo*. See *People v. Wilmington*, 2013 IL 112938, ¶ 26, 983 N.E.2d 1015; see also *People v. Wrencher*, 2011 IL App (4th) 080619, ¶ 37, 959 N.E.2d 693.

¶ 39 We have pointed out repeatedly there is no reason this issue should still be plaguing courts of review some 36 years after *People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984), and 13 years after the supreme court promulgated Rule 431(b). *People v. Neal*, 2020 IL App (4th) 170869, ¶ 191, 150 N.E.3d 984. Compliance with the rule could not be easier—the trial court is to ask each prospective juror whether that juror *understands* and *accepts* the following principles, first set forth in *Zehr*: "(1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her ***." Ill. S. Ct. R. 431(b) (eff. July 1, 2012). We have observed the language of the rule has been described by our supreme court as "clear and unambiguous, requiring a specific question and response process." (Internal quotation marks omitted.) *People v. Bell*, 2020 IL App (4th) 170804, ¶ 106, 145 N.E.3d 740 (citing *People v. Thompson*, 238 Ill. 2d 598, 607, 939 N.E.2d 403, 409 (2010)).

¶ 40 The trial court grouped the four *Zehr* principles into one question, utilizing a method which, although not ideal, has been approved repeatedly by this court. See *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 62; *People v. Willhite*, 399 Ill. App. 3d 1191, 1196-97,

927 N.E.2d 1265, 1270 (2010). Perhaps the only thing more perplexing than the continued failure of trial courts to eliminate this as an issue on appeal by following the language of the rule is its continued appearance for the first time on appeal when, from the record, it was never an issue for defendant or his counsel during trial. In *Kinnerson*, 2020 IL App (4th) 170650, ¶ 60, the defendant raised the same issue as defendant does here, claiming the trial court was required to address each Rule 431(b) principle "separately" and erred by combining them into a single statement of the law. We previously rejected this argument in *Kinnerson* and *Willhite*, and have done so again more recently in *People v. Hartfield*, 2020 IL App (4th) 170787, ¶ 59, where we found even if it was error, it was not clear or obvious ("Nothing in the text of Rule 431(b) clearly requires delivering the admonitions piecemeal with the inquiries interspersed."). In the earlier case of *People v. Staple*, 402 Ill. App. 3d 1098, 1106-07, 932 N.E.2d 1064, 1071 (2010), we approved asking the four principles in compound form and obtaining responses from panels of potential jurors answering in unison. As we said in *Kinnerson*, "[c]ontrary to defendant's suggestion on appeal, *Thompson* does not interpret Rule 431(b) as requiring a process wherein the court addresses each principle 'separately.' Rule 431(b) also contains no such requirement." *Kinnerson,* 2020 IL App (4th) 170650, ¶ 62.

¶ 41        Here, the trial court directed the prospective jurors' attention to the four *Zehr* principles, asking them to "listen carefully" since they would be asked if they "understand these principles of law and if you accept these principles of law." Next, the court properly recited all four principles and asked them by a show of hands to indicate if they understood "these principles" and again by a show of hands if they accepted them. The trial court then properly documented for the record that, as to each question, all hands were raised. As we indicated before, this may not be ideal, but is far from "clear and obvious" error.

- 15 -

¶ 42 Having found there was no error, let alone a clear and obvious one, our plain error analysis need go no further. See *Hood*, 2016 IL 118581, ¶ 18 (stating without error there can be no plain error). We hold defendant to his procedural default.

¶ 43                              C. Claimed Prosecutorial Misconduct

¶ 44 Defendant next contends comments made by the prosecutor during closing argument denied defendant a fair trial by vouching for the credibility of the State's witness and "inflaming the jury's passions."

¶ 45 Claims of prosecutorial misconduct are subject to *de novo* review. See *People v. Wheeler*, 226 Ill. 2d 92, 121, 871 N.E.2d 728, 744 (2007); *People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 50, 115 N.E.3d 270. Prosecutors have wide latitude in the content of their closing arguments. *People v. Jackson*, 2020 IL 124112, ¶ 82. "They may comment on the evidence and on any fair and reasonable inference the evidence may yield." *People v. Runge*, 234 Ill. 2d 68, 142, 917 N.E.2d 940, 982 (2009). This is true even if the suggested inference reflects negatively on the defendant. *Jackson*, 2020 IL 124112, ¶ 82. As we most recently observed in *Neal*, "[t]he Supreme Court of Illinois has long held that '[t]he prosecutor may also respond to comments by defense counsel which clearly invite a response.' " *Neal*, 2020 IL App (4th) 170869, ¶ 167 (quoting *People v. Hudson*, 157 Ill. 2d 401, 441, 626 N.E.2d 161, 178 (1993)). We noted further the prosecutor may fairly comment on characterizations of the evidence by defense counsel and may respond in rebuttal to statements which noticeably invite a response. *People v. Willis*, 2013 IL App (1st) 110233, ¶ 110, 997 N.E.2d 947.

¶ 46 On review, we are to consider closing arguments as a whole, rather than focusing on selected phrases or remarks. *Jackson*, 2020 IL 124112, ¶ 82. The standard of review applied to arguments of counsel is similar to the standard used in deciding whether a prosecutor

committed plain error. *People v. Nieves*, 193 Ill. 2d 513, 533, 739 N.E.2d 1277, 1286 (2000). "A reviewing court will find reversible error only if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error." *Jackson*, 2020 IL 124112, ¶ 83.

¶ 47    Defendant claims the prosecutor improperly vouched for A.A.'s credibility. Defendant fails to mention the comments of which he complains were part of the State's rebuttal, after defense counsel argued, "the State's entire case hangs on the testimony of [A.A.], the credibility of that testimony" and that A.A. made her most damaging allegations "[a]fter mom's new boyfriend had a chance to talk to her. After mom's new boyfriend had talked about how she might have to go to Streamwood rather than stay home. Then she suddenly remembered more details." In context, and in response, the prosecutor remarked:

"The idea that she would fabricate this falls on its face. She has nothing to gain. Nothing remains for her at this point. Nothing. She has to get on the stand and testify. She has to subject herself to cross examination. This idea that [mom's boyfriend] planted this idea in her head that wasn't true is not based off of evidence. He encouraged her to seek help, and that's what she did. He encouraged her to tell what happened, and that's what she did.

\*\*\*

You saw her on cross examination most importantly because [mom's boyfriend], a man who came into her life after this all occurred, could not possibly have presented this idea, this fabricated story that never happened to her in a way that could in

- 17 -

any way anticipate [defense counsel's] questions. And you saw her

on cross examination. Sure, tough for her at times but she got

through it. She didn't duck, weave, embellish in any way; and she

could have. And why wouldn't she? If she's making up this story,

why wouldn't she fill all these little holes, embellish her

testimony? It's because it's the truth. It's because she's telling you

what happened."

¶ 48 Defendant contends when the prosecutor said, "she's telling you what happened," in the context in which it was presented, "he vouched for her credibility", citing *People v. Schaefer*, 217 Ill. App. 3d 666, 668-69, 577 N.E.2d 855, 857 (1991), as authority. Notably, in *Schaefer*, the prosecutor made several comments, including his personal experience assessing the credibility of people as State's Attorney, how " 'what we found that night' " during a search verified the truth of a witness, and his personal opinion that " 'I think he told the truth.' " *Schaefer*, 217 Ill. App. 2d at 668. This was followed by a remark regarding his personal experience with drug cases and motives, as well as his personal experience with witnesses being afraid to testify against drug dealers. *Schaefer*, 217 Ill. App. 3d at 670. There, the Fifth District correctly found the prosecutor's comments to be plain error, noting his " 'special relation to the jury' " necessitated care "that he does not place the authority of his office behind the credibility of his witnesses." *Schaefer*, 217 Ill. App. 3d at 668-69 (quoting *People v. Roach*, 213 Ill. App. 3d 119, 124, 571 N.E.2d 515, 518 (1991)). Relevant to our analysis here, the court went on to say, "[h]e may express an opinion if it is based on the record," but that "[h]e may not, however, state his personal opinion regarding the veracity of a witness or vouch for a witness' credibility." *Schaefer*, 217 Ill. App. 3d at 668-669 (quoting *Roach*, 213 Ill. App. 3d at 124). As the State's

brief noted, a prosecutor's remarks may reflect on the credibility of a witness where the remarks are based on the evidence and inferences fairly drawn therefrom, citing *People v. Shum*, 117 Ill. 2d 317, 512 N.E.2d 1183 (1987). More recently, we reaffirmed this proposition, explaining further how "[t]he wide latitude given to prosecutors is breached 'when they express personal beliefs or opinions or invoke the State's Attorney's office's integrity to vouch for a witness's credibility.' " *People v. Long*, 2018 IL App (4th) 150919, ¶ 96, 115 N.E.3d 295 (quoting *People v. Wilson*, 2015 IL App (4th) 130512, ¶ 66, 44 N.E.3d 632). Questioning what motive a witness may have to lie, especially in response to such an accusation from defense counsel, is not an expression of personal belief in the witness's credibility. See *People v. Curry*, 2013 IL App (4th) 120724, ¶ 84, 990 N.E.2d 1269, and *People v. Robinson*, 254 Ill. App. 3d 906, 918-19, 626 N.E.2d 1242, 1252 (1993) (stating a prosecutor can reflect on witness's credibility: (1) if based on facts in the record or fair inferences or (2) if they are invited responses to defendant's comments made in closing).

¶ 49        Here, the comments of counsel were neither expressions of personal opinion, nor did they reference or invoke the integrity of the State's Attorney's office. Defendant also claimed the statements somehow "impl[y] to the jury that the prosecutor may know information that the jury was not privy to," relying on *Roach*. The *Roach* court found the prosecutor's repeated comments expressing his personal feelings and opinions about a witness's credibility amounted to misconduct because those opinions were more so the "sort of intuitive judgments that lie within the province of the jury." *Roach*, 213 Ill. App. 3d at 124. Here, we have none of that. Further, there is nothing about the prosecutor's argument which can, under any stretch of the imagination, be construed as implying some special or unique knowledge on his part.

¶ 50 Defendant also complains about a later comment in the State's rebuttal argument which he claims to be improper and intended to "inflame the jury's emotions":

"And she told you what happened. Who would want to live in a world where the victim can tell you what happened and her claim is not enough? A world where a defendant can be smart enough to pick his victim, pick his time, his place, control the situation and leave her alone?"

¶ 51 This came in response to the defense argument about how the "State's entire case" hinged on A.A.'s credibility and that *she* needed to prove the allegations beyond a reasonable doubt. It was also after defense counsel listed the various kinds of physical and medical evidence which were not present here, the implausibility of her complaints, her lack of immediate or even delayed outcry, and the inconsistency of her observed behavior around the defendant even after the sexual assaults and threats. The defense also noted the State could have "done things to bolster her credibility" but did not. Defense counsel was seeking to discredit the witness. There is nothing wrong with that. The credibility of a witness is the proper focus of closing argument if it is based on the evidence or reasonable inferences drawn from the evidence. *People v. Calderon*, 369 Ill. App. 3d 221, 236, 859 N.E.2d 1163, 1177 (2006). This is as true for the defense as it is to the prosecution. Taken in context however, the prosecutor's comment was in direct response to defense counsel's argument seeking to discredit the witness and contention, "It [defendant's guilt] can't just simply be because somebody says so." Although perhaps inartfully done, the State's rebuttal argument was nothing more than an accurate statement of the law permitting the testimony of a single witness, if positive and credible, to be sufficient for conviction. *Smith*, 185 Ill. 2d at 541. This was not the sort of "send a message" argument

- 20 -

defendant claims and supports with like authority. Instead, the prosecutor responded to defendant's argument, which implied the testimony of a victim alone would not be sufficient for conviction.

¶ 52        As the State accurately points out, since no objection was raised at trial, we are once again asked to consider the issue as plain error. " 'If no objection was made when the prosecutor vouched for the credibility of the State's witnesses, it will constitute plain error only if the comments were so inflammatory as to deny the defendant a fair trial or so flagrant as to threaten deterioration of the judicial process.' " *People v. Trice*, 2017 IL App (4th) 150429, ¶ 60, 87 N.E.3d 1087 (quoting *People v. Taylor*, 2015 IL App (4th) 140060, ¶ 39, 44 N.E.3d 1234). More importantly, a defendant cannot complain about an argument he invited. *People v. Hammonds*, 409 Ill. App. 3d 838, 866, 957 N.E.2d 386, 410 (2011). The comments of which defendant complains were all in response to his own arguments, were not inflammatory, and do not rise to the level of being "so flagrant as to threaten deterioration of the judicial process." *Trice*, 2017 IL App (4th) 150429, ¶ 60.

¶ 53        Since the comments of the prosecutor were not error at all, let alone plain error, our plain error analysis end here. See *Wilson*, 2015 IL App (4th) 130512, ¶ 65 (stating the initial step for plain error analysis is to determine whether there was error at all; if not, there can be no plain error); see also *Hood*, 2016 IL 118581, ¶ 18. Once again, we hold defendant to his procedural forfeiture. Hoping to cover all his bases, defendant argues in the alternative we should excuse his forfeiture by finding counsel's failure to object constitutes ineffective assistance of counsel. But having found there to be no error, there is no need to address the oft-cited two-pronged test in *Strickland v. Washington*, 466 U.S. 668, 687(1984), *i.e.*, that (1) counsel's performance was deficient and (2) the deficient performance prejudiced defendant. Failure to

- 21 -

establish either precludes a finding of ineffective assistance of counsel. *People v. Henderson*, 2013 IL 114040, ¶ 11, 989 N.E.2d 192. Absent error, there is no deficiency.

¶ 54 D. Improper Consideration of a Factor Implicit in the Offense

¶ 55 Finally, defendant contends the trial court erred when it considered the "psychological harm" to the victim when imposing defendant's sentence since such harm was already factored into the range of sentences set by the legislature for predatory criminal sexual assault. "A factor implicit in the offense for which a defendant has been convicted cannot be used as an aggravating factor in sentencing for that offense, absent a clear legislative intent to allow such use of the factor." *People v. Milka*, 211 Ill. 2d 150, 184, 810 N.E.2d 33, 52 (2004).

¶ 56 "Whether a trial court considered an improper factor when sentencing a defendant is a question of law, which we review *de novo*." *People v. Winchester*, 2016 IL App (4th) 140781, ¶ 72, 66 N.E.3d 601. "There is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, and a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court." *People v. Canizalez-Cardena*, 2012 IL App (4th) 110720, ¶ 22, 979 N.E.2d 1014. It is the defendant's burden to affirmatively establish the trial court relied on an improper sentencing factor when fashioning its sentence. *People v. Williams*, 2018 IL App (4th) 150759, ¶ 18, 99 N.E.3d 590.

¶ 57 Having never raised this issue in the trial court, either by objection at sentencing or in a motion for reconsideration, we are once again asked to disregard the procedural forfeiture either under plain error or as a matter of ineffective assistance. As we have seen above, first we must determine whether there was any error at all.

¶ 58 Defendant relies, in large part, on *People v. Calva*, 256 Ill. App. 3d 865, 628 N.E.2d 856 (1993), for its argument that psychological harm caused by a sex crime on a child is

not a proper factor to be considered in aggravation of sentence for that crime. This reasoning in *Calva* has been distinguished by the Fifth District in *People v. Bunning*, 2018 IL App (5th) 150114, ¶ 21, 103 N.E.3d 864, as well as unreported cases from this and other Districts. See *People v. Winkler*, 2016 IL App (4th) 160180-U, ¶ 20; *People v. Janes*, 2020 IL App (4th) 200068-U, ¶ 104; *People v. Ford*, 2020 IL App (1st) 171493-U, ¶¶ 26-29; *People v. Tolentino*, 2015 IL App (2d) 140856-U, ¶ 28; see also amended Ill. S. Ct. Rule 23(e)(1) (eff. Jan. 1, 2021) (stating nonprecedential orders under Rule 23(b) may be cited for persuasive purposes). In fact, we expressly rejected this reasoning in *People v. Phillips*, 2014 IL App (4th) 130300-U, ¶ 42. In *Phillips*, we relied upon cases from our sister districts as well as from our supreme court in support of rejecting the *Calva* court's reasoning (*People v. Nevitt*, 228 Ill. App. 3d 888, 892, 593 N.E.2d 797, 799 (1992); *People v. Ulmer*, 158 Ill. App. 3d 148, 149-51, 510 N.E.2d 1296, 1297-98 (1987); *People v. Lloyd*, 92 Ill. App. 3d 990, 991, 995-96, 416 N.E.2d 371, 372, 376 (1981); *People v. Burton*, 102 Ill. App. 3d 148, 150, 153-54, 429 N.E.2d 543, 545, 547 (1981); *People v. Kerwin*, 241 Ill. App. 3d 632, 636, 610 N.E.2d 181, 185 (1993); *People v. Huddleston*, 212 Ill. 2d 107, 816 N.E.2d 322 (2004)). *Phillips*, 2014 IL App (4th) 130300-U, ¶ 42.

¶ 59 *Calva* is an outlier, and of the 27 times it has been cited by Illinois courts as of this writing, none have been in actual support of defendant's proposition here.

¶ 60 Psychological trauma to a victim can be considered as an aggravating factor even without direct evidence of trauma. See *People* v. *Reber*, 2019 IL App (5th) 150439, ¶ 94, 125 N.E.3d 551 (favorably citing this court's decision in *Burton*, 102 Ill. App. 3d at 154). When the court in *Bunning* distinguished *Calva*, it cited three bases, all of which are present here: (1) the defendant in *Calva* pleaded guilty, whereas, here, as in *Bunning*, the trial court observed A.A.'s testimony firsthand; (2) unlike *Calva*, in *Bunning* and here, the trial court noted the evidence of

A.A. having been in treatment; and (3) in both *Bunning* and the case *sub judice*, victim impact statements outlined the devastation to A.A.'s life caused by the psychological and emotional effect of the offenses. Further, although it may be true that harm which is implicit in an offense cannot be considered as evidence in aggravation (*People v. Conover*, 84 Ill. 2d 400, 404, 419 N.E.2d 906, 908 (1981)), the supreme court has made it clear that the *degree* of harm may well be an appropriate subject for consideration. *People v. Saldivar*, 113 Ill. 2d 256, 269, 497 N.E.2d 1138, 1143 (1986).

¶ 61 Harm is not an element or inherent in the offense. *Kerwin*, 241 Ill. App. 3d at 636. Even if it were, as we noted above, most cases addressing this issue have found the psychological harm suffered by child victims of sexual assault proper for consideration in sentencing. See, *e.g.*, *Nevitt*, 228 Ill. App. 3d at 892 (psychological harm to a three-year-old victim was a proper consideration when sentencing for aggravated criminal sexual assault); *Ulmer*, 158 Ill. App. 3d at 151 (a proper aggravating factor for the court to consider was the psychological harm to 10-year-old victim); *Burton*, 102 Ill. App. 3d at 153-54 (psychological trauma to child victim was properly considered as an aggravating factor).

¶ 62 Defendant's only claim of error in sentencing is that the psychological harm to the victim was not a proper consideration for the court. Having concluded that it is, there was no error. If there is no error, there can be no plain error and defendant's forfeiture must be honored. Moreover, we find the result would have been no different had counsel raised the issue before the trial court and therefore, defendant's claim of ineffective assistance also fails. *People v. Evans*, 209 Ill. 2d 194, 219-20, 808 N.E.2d 939, 953-54 (2004).

¶ 63 III. CONCLUSION

¶ 64          For the reasons set forth above, we affirm the judgment and sentence of the trial

court.

¶ 65          Affirmed.